Evan S. Nadel (SBN 213230)
ENadel@mintz.com
**MINTZ, LEVIN, COHN, FERRIS,**
 **GLOVSKY AND POPEO, P.C.**
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone:  (415) 432-6000; Facsimile: (415) 432-6001

Keith P. Carroll (MA BBO # 666039) (*pro hac vice forthcoming*)
KPCarroll@mintz.com
Sean B. Kennedy (MA BBO # 703560) (*pro hac vice forthcoming*)
SBKennedy@mintz.com
**MINTZ, LEVIN, COHN, FERRIS,**
 **GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA  02111
Telephone:  (617) 542-6000; Facsimile:  (617) 542-2241

Attorneys for Plaintiffs
M.A. Silva Corks USA, LLC  and Neil Foster

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.A. Silva Corks USA, LLC and Neil Foster<br><br>*Plaintiffs*,<br> vs.<br><br>M.A. Silva Cortiças, Lda.; M.A. Silva Holdings, Inc.; Manuel Alves da Silva, Sr.; José Duarte Tavares da Silva; Cork Partners International Ltd.; Iberian Cork International Ltd.; and Does 1-25<br><br>*Defendants*. | CASE NO.  3:22-cv-4345<br><br>**COMPLAINT FOR RACKETEERING; RACKETEERING CONSPIRACY; FRAUD; CIVIL CONSPIRACY TO COMMIT FRAUD; TORTIOUS INTERFERENCE WITH CONTRACT; CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH CONTRACT; TORTIOUS BREACH OF STATUTORY REQUIREMENT OF GOOD FAITH AND FAIR DEALING; CIVIL CONSPIRACY TO COMMIT TORTIOUS BREACH OF STATUTORY REQUIREMENT OF GOOD FAITH AND FAIR DEALING; BREACH OF FIDUCIARY DUTY; BREACH OF CONTRACT; AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. This case is about a continuing web of international schemes borne out of jealously and greed and interwoven by recurrent acts of fraud, corporate espionage, forgotten loyalty, disregarded contracts, and secret Maltese shell companies.

2. M.A. Silva Corks USA, LLC ("Corks USA"), co-founded by Neil Foster in 2000, is an award-winning distributor of premium corks, glass and packaging for the North American wine industry.

3. Neil's co-founder of Corks USA is one of the defendants in this case, Manuel Alves da Silva, Sr. ("MAS"). MAS is the patriarch of the Silva family and founder of several family-owned and operated businesses in Portugal with a global presence and over five decades of cork-manufacturing experience. The concept behind the formation of Corks USA, which was and for now still remains a 50/50 joint venture between Neil and the Silva family, was to capitalize on Neil's extensive contacts and good reputation in the highly competitive United States wine industry and to develop a stronger presence on an exclusive basis for the Silva family's corks in the United States market.

4. The concept worked. From 2000 until approximately 2015, the Corks USA business thrived under Neil's leadership and management, growing from an idea in a business plan to a profitable business with in excess of $40M in annual sales and over 40 employees. In 2010, Corks USA also expanded its product line to include a variety of high quality and proprietary glass bottles to better serve its customers in the North American wine industry.

5. That sustained trajectory of success, however, would soon start to experience unseen challenges, the full extent of which went unrealized by Neil until very recently. Concerned about increasingly difficult and curious behavior by the Silvas, Neil began to investigate the suspicions he had about the Silvas' loyalty to Corks USA and Neil. Neil's active and ongoing investigation uncovered shocking behavior by the Silvas, which may yet prove to be even worse than what has been uncovered to date when information in the Silva's control comes to light. As his investigation revealed, the aforementioned challenges which confronted Neil and Corks USA

coincided with an internal shift in power within the Silva family in or around 2015. Around that time, MAS, who is now 77 years old, began to take a step back from running the Silva family businesses and allow his son, José Silva, to take over the family business.  Neil and Corks USA soon bore the brunt of that decision as José, with his father's full knowledge and support, set out first to dilute and then obtain Neil's financial stake in Corks USA at a considerable discount through both overt and covert ways.

6.     This scheme was also consistent with Silva family-business practices toward other business partners during this same period. Upon information and belief, the Silvas enticed others like Neil to partner with them in other countries to build a distribution network and local market presence for M.A. Silva cork only to have the Silvas use fraud, deception, concealment, predatory practices, and whatever else worked to shift the value of those ventures over time from their business partners to themselves.

7.     As detailed below, Defendants and their co-conspirators, known and unknown, embarked on a multi-faceted pattern of acts to defraud, extort, bully, and undermine Neil and Corks USA. This pattern involved, among other things, unauthorized sales of Silva family corks directly into the United States market that were deliberately hidden from Neil and Corks USA, ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████, the use of secret Maltese shell companies to backdoor additional cork shipments to Corks USA's competitors in the United States market, and finally, threats against, direct challenges to, and interference with Neil's express authority to manage Corks USA and to be compensated fairly for his good efforts.

8.     Defendants and their co-conspirators, known and unknown, conspired to carry out these interrelated acts to wrongfully force Neil to give up his financial interest in Corks USA at the lowest price possible—a playbook they had just as wrongfully followed with others.

**II.    PARTIES**

9.     M.A. Silva Corks USA, LLC, referred to herein as Corks USA, is a limited liability company organized under the laws of California with its principal place of business in Santa Rosa, Sonoma County, California. It is jointly owned by Neil Foster and M.A. Silva Holdings, Inc. in equal 50% shares.

10.     Neil Foster is an individual and a resident of Sonoma County, California.  He is the president, a founding member, and one of the two 50% co-owners of Corks USA.  Neil has been and continues to serve as the manager of Corks USA since its formation on October 19, 2000.

11.     M.A. Silva Cortiças, Lda. ("Cortiças") is a corporation organized under the laws of the Country of Portugal with its principal place of business in Mozelos, Portugal.  It is owned and controlled by the Silva family.

12.     M.A. Silva Holdings, Inc. ("Holdings") is a California corporation with its principal place of business in Santa Rosa, Sonoma County, California.  Holdings is 100% owned and controlled by Cortiças.  Holdings owns 50% of Corks USA.

13.     Manuel Alves da Silva ("MAS") is an individual and Portuguese citizen.  MAS is the founder and president of M.A. Silva Cortiças, Lda.  This position requires him to regularly conduct business in California.

14.     José Duarte Tavares da Silva ("José Silva") is an individual and Portuguese citizen. José Silva is the Chief Executive Officer of M.A. Silva Cortiças, Lda.  This position requires him to regularly conduct business in California.

15.     Cork Partners International Ltd. is a limited liability company organized under the laws of the Country of Malta with a listed address of 114 The Strand, Gzira GZR 1027, Malta. MAS owns 60% of Cork Partners International Ltd., while José Silva owns 40%.  José Silva is listed as a director of Cork Partners International Ltd.

16.     Iberian Cork International Ltd. is a limited liability company organized under the laws of the Country of Malta with a listed address of 114 The Strand, Gzira GZR 1027, Malta. MAS owns 60% of Iberian Cork International Ltd., while José Silva owns 40%.  José Silva is listed as a director of Iberian Cork International Ltd.

17.    Does 1–25 conspired with Defendants to perform the conduct alleged below. Plaintiffs do not yet know the identities of Does 1–25.

**III.    JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

19.    Venue is proper in this District because a substantial amount of the conduct giving rise to the Counts in this Complaint took place in this District.

**IV.    FACTUAL BASIS FOR CLAIMS**

**A.    The beginning:  the Parties form Corks USA and grant it exclusive distribution rights in the United States.**

20.    MAS founded Cortiças in 1972. Cortiças manufactures cork bottle stoppers used in bottling wine.  They produce these stoppers by harvesting cork oak trees, punching the corks from the wood, and then molding the agglomerated cork byproduct into a stopper, known as a cork.

21.     The wine industry needs a variety of different types of corks to ensure wine does not spoil before a consumer opens the bottle.  Different kinds of wine (table, sparkling, champagne, etc.) require different kinds of corks.

22.    Corks also vary in terms of quality.  Different qualities of wine warrant different qualities of corks.

23.    Cortiças manufactures a broad range of corks.  It uses different processes to produce different types of corks to serve the wide variety of wines the industry produces.

24.    In the late 1990s, Cortiças sought to expand its presence to the United States with a US-based distribution partner.

25.    Then and now, the Napa and Sonoma regions in California place among the top wine-producing areas in the United States. Accordingly, Cortiças concentrated its search for a partner in those regions.

26.    At the same time, Neil, who for many years served as a buyer for the cork industry in California, was considering pivoting his career into distribution.

27.     Neil had a relationship with Cortiças and its ownership stemming from his time as a cork buyer.

28.     MAS first proposed to Neil that the two go into business together.  About a year later, Neil delivered a business plan to MAS.

29.     Cortiças and Neil entered negotiations to develop a distribution agreement. Around October 2000, the parties agreed to form Corks USA as a California limited liability company. Under this agreement, Cortiças would create a new corporation, Holdings, to serve as an owner of Corks USA.  Holdings would own 50% of Corks USA, and Neil would own the other 50%.

30.     Holdings and Neil entered into an Operating Agreement for Corks USA on October 19, 2000.  Ex. A.  The purpose of Corks USA was to import and sell Cortiças corks, and Neil was appointed as the sole Manager of Corks USA.  *Id.*  The Operating Agreement also expressly "vested entirely" to Neil "[t]he right to exercise the powers of the Company and to manage the business and affairs of the Company" and gave Neil the imperative "to make such rules for the conduct of the business as he sees fit, so long as the same are in compliance with the [Operating Agreement] and the Management Agreement."  *Id.*

31.     Consistent with the Operating Agreement, which expressly required the creation of a "Management Agreement" to "further describe[]" "[t]he Manager's rights and obligations," Corks USA and Neil executed an "Employment Agreement" that set forth additional rights and obligations for Neil as the "Manager" of Corks USA.  Ex. B.

32.     The Employment Agreement, among other rights and obligations, specifically states that the "Manager is not authorized to purchase or promote corks from any party aside from M.A. Silva Cortiças Lda."  Ex. B.

33.     With that foundation in place, Neil took steps to establish Corks USA as the exclusive marketer and distributor for Cortiças corks in the United States.  In January 2001, Cortiças and Corks USA entered into a Supply and Distribution Agreement.  Ex. C.

34.     The Supply and Distribution Agreement granted Corks USA the exclusive right to market and distribute Cortiças corks in the United States, subject to three specific already-existing relationships.  Ex. C.

35.     The Supply and Distribution Agreement restricts Corks USA from obtaining corks from, or engaging in distribution of cork stoppers made by, any entity other than Cortiças.  Ex. C.

36.     The Supply and Distribution Agreement also requires Cortiças to inform Corks USA of any potential new customers for corks in the United States.  If Corks USA agrees to allow the new customer to become a direct Cortiças customer, which Corks USA is not required to permit, the Supply and Distribution Agreement requires Cortiças to pay Corks USA "a referral fee on an ongoing basis in the amount of five percent of the invoice amount from that customer, when and as received by" Cortiças.  Ex. C.

37.     The Supply and Distribution Agreement further requires Cortiças to "supply all the cork requested by [Corks USA] in accordance with [Corks USA's] orders."  It also requires Cortiças to "timely deliver all such quantities of cork in accordance with the" Agreement's terms, and to use "all reasonable endeavors to meet the delivery date" Cortiças is required to give Corks USA "[u]pon receipt and confirmation of each order."  Ex. C.

38.     The Supply and Distribution Agreement sets the standards for the quality of corks Cortiças must produce when selling to Corks USA.  It requires Cortiças to ensure all corks supplied to Corks USA conform to "established standard cork grades . . . with a reasonable allowance for natural variation in the product."  It also requires Cortiças to perform a series of pre-shipping tests on the corks it sells to Corks USA, and to use "all reasonable endeavors to meet the delivery date" that Cortiças is required to give Corks USA "[u]pon receipt and confirmation of each order."  Ex. C.

39.     If a cork sold to Corks USA by Cortiças has any defects, the Supply and Distribution Agreement requires Cortiças to, upon notice, "either promptly credit [Corks USA] or promptly replace the defective corks at no charge to" Corks USA.  Ex. C.

**B.     Corks USA's success requires increased financing, and Neil personally guarantees it.**

40.     With the necessary agreements in place, over the next five years, Neil built Corks USA into a successful business enterprise.

41.     To ensure continued growth, in 2006, Neil and Corks USA sought to secure bond financing for a US-based cork manufacturing and processing facility.

42.     Neil (through his revocable trust) and Holdings both agreed to allow Corks USA to enter into the transaction.

43.     Corks USA and Neil eventually secured a bond financing and loan agreement between Corks USA and the California Infrastructure and Economic Development Bank ("CIEDB").

44.     The transaction involved Bank of America issuing a direct pay letter of credit to CIEDB.  CIEDB would then issue its own letter to Corks.

45.     As part of this transaction, Bank of America required Neil to personally guarantee all of Corks USA's liabilities to Bank of America through CIEDB.

46.     To induce and enable Neil to enter into the personal guarantee called for by Bank of America as a condition of issuing its own direct pay letter of credit, Holdings (via MAS) and Neil (through his revocable trust), agreed to amend the Operating Agreement in several significant ways.  Ex. D.

47.     Among the amendments that Holdings expressly agreed to make to the Operating Agreement in December 2006 are as follows:

48.      First, it was agreed that Section 2.4 of Article 2 of the Operating Agreement, which originally read as follows:

> **Duration of Company.** The duration of the Company and this Agreement is until January 1, 2030, as provided in the Articles, unless the Company is dissolved earlier pursuant to this Agreement, or extended by the written agreement of all its Members.

would be replaced (and was replaced) by the following:

**Term of Existence.**  The term of existence of the Company shall  commence on the effective date of filing of the Articles with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

49.     Second, it was agreed that Article 5 of the Operating Agreement, which originally read as follows:

**Article 5: Management Rights In Manager.**  The right to exercise the powers of the Company and to manage the business and affairs of the Company is vested entirely in the Manager.  The Manager's rights and obligations are further described on (sic) a Management Agreement between Company and Member (sic).  The Manager need not be a Member.  The Manager will make such rules for the conduct of the business as he sees fit, so long as the same are in compliance with this Agreement and the Management Agreement.  There will be (sic) at all times be no more than one Manager.

would be replaced (and was replaced) by the following:

The business, property and officers (sic) of the Company shall be managed exclusively by the Manager.  Unless the approval of the Members is expressly required by this Agreement, the Manager shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding these matters and to perform any and all acts or activities customary or incident to the management of the Company's business, property and affairs.

50.     Third, it was agreed that Article 6 of the Operating Agreement, which originally read as follows:

Article 6: Elections of Manager

6.1  Neil Foster will serve as the first Manager.

6.2  The Manager will be elected, or re-elected, at the annual meeting of Members or at a special meeting called for the purpose of electing a Manager.  The Manager may also be designated by the unanimous written consent of the Members.

6.3  The initial term of service for Manager is three years.  After that point, if all Members agree, then the term of the Manager can be extended for additional one year periods.

would be replaced (and was replaced) by the following:

8

COMPLAINT

The Company shall initially have one (1) Manager.  Neil Foster shall serve as the initial Manager.  Unless the Manager resigns or is removed, the Manager shall hold office until a successor shall have been duly elected and qualified.

51.     Fourth, it was agreed that Article 7 of the Operating Agreement, which originally read as follows:

**Article 7:  Removal of Manager.** The Members may remove a Manager before the expiration of his term if he has acted in violation of any law or this Agreement.

would be replaced (and was replaced) by the following:

Except as provided by law, the Manager may only be removed with the prior written consent of all of the Members.  The Manager may resign at any time upon giving written notice to the Members.

52.     Fifth, it was agreed that Article of the Operating Agreement which originally read as follows:

**Article 11: Member Compensation.**  No Member will be paid any compensation for its services as such.  The Manager's compensation is addressed in the Management Agreement.

would be replaced (and was replaced) by the following:

Any Member who also acts as the Manager, or any Member that provides the services of any person to act as the Manager, shall be entitled to receive a guaranteed payment.  The amount of such guaranteed payment shall be as agreed from time to time by the Members.  The Manager shall not be entitled to receive any compensation for his services as such.

53.     Relying on the amendments made to the Operating Agreement, Neil personally guaranteed the 2006 bond financing, and Corks USA was able to obtain the loan.

54.     Neil still remains liable and obligated to Bank of America to personally guarantee any and all of Corks USA's ongoing obligations and liabilities under the 2006 bond financing loan.

55.     At the time of the 2006 bond financing and execution of the First Amendment to the Operating Agreement, the guaranteed payment due to Neil under the Operating Agreement, as amended, for his services as manager of Corks USA, was an amount equal to 2.8% of the gross

revenue of Corks USA. This guaranteed was separate from and in addition to Plaintiff's entitlement to his 50% share of Corks USA's annual net profit.

56.     Around January of 2010, on Neil's recommendation and with MAS's express support and approval, Corks USA began incorporating the sale and distribution of glass wine bottles into the scope of Corks USA's business operations. The glass business started by Neil, first as a separate company and then subsequently as part of Corks USA, was complimentary to the cork business and increased the revenue potential for Corks USA and profit potential for its owners. Around January 2011, Neil and Holdings (through MAS) agreed to increase Plaintiff's guaranteed payment for management services to an amount equal to 3.8% of Corks USA's gross revenue.

57.     From 2011 through 2015, Neil continued to manage Corks USA and oversee and attend to all of its operations, business, and affairs, and continued to receive the guaranteed payment due him under the Operating Agreement, as amended, and as separately confirmed by the Employment Agreement.  At the same time, Plaintiff continued to share equally with Holdings in the distribution of Corks USA's annual net profit. Cortiças and its affiliate M.A. Silva 2 also received substantial payments from Corks USA for the traditional and technical corks provided to Corks USA.

**C.     A change in the guard.**

58.     Beginning in 2015, MAS —who had led Cortiças for about 43 years—begin to pull back from his leadership role.

59.     José Silva, MAS's son, began fill the roles his father had left open and take on more responsibility in the family business.

60.     By word and deed, José Silva made it clear that he wanted to eliminate Neil from his Manager role at Corks USA.

61.     José Silva also did not like the compensation rate for Neil that previously had been agreed to by MAS, and was not pleased with Neil's integration of glass wine bottles into the scope

of Corks USA's business operations. Thus, José sought to eliminate Neil from Corks USA's operations.

62.     On information and belief, MAS supports José's efforts to eliminate Neil from Corks USA and has taken no action to prevent José from carrying out his plan.

63.     With his father's support to eliminate Neil at the lowest possible cost, José Silva embarked on a series of schemes to sabotage Corks USA, undermine Neil's reputation, and arrange for Neil's departure from Corks USA.  In doing so, the Silvas drew on their experience performing similar schemes against other distribution partners around the world.

64.     Throughout this series of schemes, the Silvas had the support of co-conspirators, known and unknown.

> **1.     For at least ten years, the Silvas break their exclusivity with Corks USA—and recently use Maltese shell companies as a backdoor.**

65.     On information and belief, and based on Neil's investigation to date, for at least ten years, the Silvas and their co-conspirators, known and unknown, have conspired to line their own pockets at the expense of Corks USA by selling corks to Company A in a conspiracy to backdoor around Cortiças's exclusivity agreement with Corks USA.  Such conduct was designed to and did harm Corks USA.

66.     Company A is a wine and beverage supplies company for the North American wine and specialty beverage industry.

67.     Company A directly competes with Corks USA in the cork realm.

68.     Neither the Operating Agreement nor the Supply and Distribution Agreement allows Cortiças to sell corks to Company A in the United States without Neil's permission as Manager of Corks USA.

69.     No other agreement between Cortiças or Holdings and Neil or Corks USA allows Cortiças to sell corks to Company A in the United States.

70.     Despite the above, on information and belief, and based on Neil's investigation to date, for at least ten years, the Silvas and their co-conspirators, known and unknown, have been selling corks to Company A through both Cortiças and at least two Maltese shell companies.  These sales have taken place repeatedly over that time.

71.     On information and belief, and based on Neil's investigation to date, Company A knowingly purchased these corks from Cortiças with full awareness that these purchases violated Cortiças's exclusivity agreement with Corks USA.

72.     On information and belief, and based on Neil's investigation to date, the Silvas and their conspirators have taken steps to hide their sales to Company A by, among other things, concealing and/or changing the labeling of their corks at their factory to hide Company A as the destination and hiding any signs or indicators of shipments being prepared within the Cortiças factory for Company A.  Plaintiffs were excluded from this activity, and the times, dates, and other circumstances surrounding this activity are within the exclusive knowledge of Defendants and their co-conspirators, known and unknown.

73.     On information and belief, and based on Neil's investigation to date, to further hide their sales to Company A, the Silvas and their conspirators, known and unknown, also set up at least two shell companies in Malta: Cork Partners International Ltd. and Iberian Cork International Ltd.  They used these companies to sell cork products to competitors of Corks USA while not alerting anyone of a violation of the exclusivity agreement.

74.     Cork Partners International, Ltd. was established under Maltese law in July 2017.  Ex. E.  José Silva is listed as a director of Cork Partners International, Ltd., and both MAS and José Silva are listed as its beneficial owners.  Exs. F–G.

75.     Iberian Cork International, Ltd. was also established under Maltese law in July 2017.  Ex. H.  José Silva is listed as a director of Iberian Cork International, Ltd., and both MAS and José Silva are listed as its beneficial owners.  Exs. I–J.

76.     On October 17, 2021, United States Customs and Border Protection received a bill of lading (a document issued from a carrier to a shipper that contains information about items

12
COMPLAINT

being shipped) describing a shipment of corks from Iberian Cork International Ltd. to Company A in Petaluma, California.

77.    On January 30, 2022, United States Customs and Border Protection received another bill of lading describing a shipment of corks from Iberian Cork International Ltd. to Company A in Petaluma, California.

78.    Plaintiffs were excluded from this activity, and other times, dates, and circumstances surrounding this activity are within the exclusive knowledge of Defendants and their co-conspirators, known and unknown.

79.    In sum, for at least ten years, the Silvas and their co-conspirators, known and unknown, through Cortiças and the two Maltese companies, have conspired with Company A to violate Corks USA's exclusivity agreement.  In doing so, the Silvas, Company A, and their co-conspirators, known and unknown, used the mail, wires, and other instrumentalities in interstate commerce.

80.    Further, the Silvas and their co-conspirators, known and unknown, through Cortiças and the two Maltese companies, have conspired with Company A to defraud Corks USA by covering up, through assorted means, the illicit conduct occurring between Cortiças and Company A.  In doing so, the Silvas, Company A, and their co-conspirators, known and unknown, used the mail, wires, and other instrumentalities in interstate commerce.

81.    The Silvas and their co-conspirators, known and unknown, deliberately concealed their dealings with Company A. Company A likewise deliberately concealed its dealings with Cortiças and the Silvas. In doing so, the Silvas, Company A, and their co-conspirators used the mail, wires, and other instrumentalities in interstate commerce. Plaintiffs were also excluded from this activity, and the times, dates, and other circumstances surrounding the fraud are within the exclusive knowledge of Defendants and their co-conspirators, known and unknown.

82.    The Silvas and their co-conspirators, known and unknown, engaged in the above actions with the intent to enrich themselves and obtain something of value:  revenue and profits

that would otherwise have been shared with Neil and a lower valuing of Neil's ownership share in Corks USA, which the Silvas and their co-conspirators intended to buy at the lowest price possible.

14



COMPLAINT



COMPLAINT



17

COMPLAINT



18
COMPLAINT



COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**6.      The Silvas and their co-conspirators engaged in the above actions as part of a pattern in practice of racketeering and corrupt activity disguised as business practices—and have engaged in similar conduct in the past.**

127.    The conduct engaged in by the Silvas and their co-conspirators is not the first time that the Silvas have engaged in illicit conduct designed to devalue a business partners' economic interests so that the Silvas could take over that interest at a considerable discount. The Silvas and their co-conspirators, known and unknown, have in the past engaged in a pattern of racketeering activity to acquire interests in companies at the lowest cost to them.

128.    For example, the Silvas and their co-conspirators, known and unknown, desired to buy out one of their distribution partners in another country.  To do so at the lowest cost to them, the Silvas and their co-conspirators, known and unknown, engaged in a pattern of racketeering activity that included violating the distribution partner's exclusivity agreement in the same manner as described above.

**7.      The Silvas threaten Neil and abuse the California civil court system in furtherance of their schemes.**

129.    To further their goal of injuring Neil and devaluing Corks USA, MAS, on behalf of Holdings, advised Neil in July 2019 that he was terminated from Corks USA as of September 2019. MAS further threatened that if Neil were to receive compensation consistent with the parties' past practices an agreements after September 2019, Holdings would take punitive action against Plaintiff and seek to remove him as the Manager of Corks.

130.    In making that threat, MAS knew and understood that he was not only threatening Plaintiff's livelihood but also the value of his ownership interest in the Corks USA business.

131.    Rather than risk a disruption to the Corks USA business that would assuredly occur if MAS carried through on his threat to try and remove Neil as Manager of Corks USA, Neil instead paused the compensation he was entitled to receive for his duties as Manager of Corks USA and sought an answer from the California state courts on the whether MAS's assertion that Neil's role as Manager, and his right to be compensated, ended in September 2019 was correct.

132.     MAS did not deviate from its planned course to grind Neil down. Rather than deal with Neil in good faith to set his compensation on an annual basis, as required by the Employment Agreement, MAS instead took a "no-pay" position and was content to drag out the litigation, avoid depositions until compelled and sanctioned by the Court, and offered no justification for the threats made back in 2019 with regard to Neil's compensation. The reality is MAS asserted no counterclaims and offered no facts in support of its position, as the discovery record proved, because they knew there was no legitimate reason to contest Neil's right to be compensated for his duties as Manager of Corks USA.

133.     Such deleterious litigation conduct caused Neil to incur substantial litigation fees and costs which he is entitled to recover.

**D.     The damages to Corks USA caused by the Silvas.**

134.     The above-described conspiracy to devalue Corks USA and reduce the price to buy-out Neil's ownership interest has caused widespread damage.

135.     First, Corks USA's value has dropped due to this conspiracy, in an amount to be determined at trial.

136.     Second, Corks USA has lost multiple customers due to this conspiracy.  As a result of the Silvas' actions, Corks USA has lost multiple accounts and former customers to other cork stopper distributors.

137.     Third, the Silvas and their co-conspirators, known and unknown, have actively aided Corks USA's competitors to undermine its value.  As noted above, the Silvas and their co-conspirators, known and unknown, have underhandedly sold cork stoppers to at least one of Corks USA's direct competitors:  Company A.  Company A has played an active part as a co-conspirator in the above conspiracy.  On information and belief, Cortiças and the Silvas and their co-conspirators, known and unknown, have sold millions of dollars of cork stoppers per year to Company A.

138.     Fourth, due to the conspiracy, Corks USA's reputation for delivering high quality cork stoppers at competitive prices has dwindled.  Thus, it has lost future income in an amount to be determined at trial.

139.     Fifth, the conspiracy tarnished Neil's reputation in the cork stopper industry.  Such a reputation is difficult, if not impossible, to regain in light of the above-noted events.

## V.     CAUSES OF ACTION

### COUNT I

**Racketeer Influenced and Corrupt Organizations (RICO) Act:  Violation of 18 U.S.C. § 1962(c) (against Holdings, Cortiças, MAS and José Silva)**

140.     Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

141.     Holdings, Cortiças, MAS and José Silva in concert with co-conspirators known and unknown, have violated 18 U.S.C. § 1962(c) by being associated with an enterprise, namely Corks USA, and conducting or participating, directly or indirectly, in the conduct of that enterprise, through a pattern of racketeering activity.

142.     Holdings is associated with the enterprise Corks USA because it is a 50% owner of that enterprise. Cortiças is associated with the enterprise Corks USA because it owns and controls Holdings, which is a 50% owner of that enterprise. MAS and José Silva are associated with the enterprise Corks USA because they own and control Holdings, which is a 50% owner of that enterprise, through a web of other family owned entities, including Cortiças.

143.     As alleged above, Holdings, Cortiças, MAS and José Silva in concert with co-conspirators known and unknown, embarked on a multi-faceted pattern of acts to defraud, extort, bully, and undermine Neil and take control of Corks USA through a pattern of racketeering activity. This pattern involved, among other things, unauthorized sales of Silva family corks directly into the United States market that were deliberately hidden from Neil and Corks USA (wire fraud, in violation of 18 U.S.C. § 1343), ██████████████████████████

(mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343),

████████████████████████████████████████████████████

██████████████████████████████████████████████ (wire fraud, in

violation of 18 U.S.C. § 1343), ██████████████████████████████████

██████████████████████████ (wire fraud, in violation of 18 U.S.C. §

1343), the use of secret Maltese shell companies to backdoor additional cork shipments to Corks

USA's competitors in the United States market (wire fraud, in violation of 18 U.S.C. § 1343), and

finally threats against, direct challenges to, and interference with Neil's express authority to

manage Corks USA and to be compensated fairly for his good efforts (interference with commerce

by extortion, in violation of 18 U.S.C. § 1951).  Such activities establish a pattern of racketeering

within the meaning of 18 U.S.C. § 1961(1).

144.    Upon information and belief, this pattern of wrongful facts bears resemblance to a

broader pattern of wrongful acts designed to take advantage of other business partners of the Silvas

in other areas and markets around the globe.

145.    The above-noted pattern of racketeering activity took place after the effective date

of the RICO statute, and at least two of the acts were committed within ten years of each other.

146.    The above-noted pattern of racketeering activity affected and continues to effect

interstate or foreign commerce because it involved commerce taking place among the United

States and with at least two foreign countries:  Portugal and Malta.

147.    The enterprise, Corks USA, affected and continues to effect interstate or foreign

commerce because it is engaged in commerce taking place among the United States and with

Portugal.

148.    These actions of Holdings, Cortiças, MAS and José Silva violate 18 U.S.C. §

1962(c).

149.    As a result of this violation of 18 U.S.C. § 1962(c) by Holdings, Cortiças, MAS

and José Silva and co-conspirators known and unknown, Plaintiffs have been and continue to be

injured in their business and property in an amount to be determined at trial that is estimated to be

in the tens of millions of dollars. Plaintiffs seek all relief available under 18 U.S.C. § 1964, including but not limited to injunctive relief under § 1964(a) and treble damages and attorney's fees under § 1964(b).

## COUNT II

**RICO Act:  Violation of 18 U.S.C. § 1962(c) (against MAS and José Silva)**

150.    Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

151.    MAS and José Silva, in concert with co-conspirators known and unknown, have violated 18 U.S.C. § 1962(c) by being employed or associated with an enterprise, namely Cortiças, and conducting or participating, directly or indirectly, in the conduct of that enterprise, through a pattern of racketeering activity.

152.    MAS and José Silva are associated with the enterprise Cortiças because they own and control Cortiças either individually or through a web of other family owned entities.

153.    As alleged above, MAS and José Silva, in concert with co-conspirators known and unknown, embarked on a multi-faceted pattern of acts to defraud, extort, bully, and undermine Neil and take control of Corks USA through a pattern of racketeering activity.  This pattern involved, among other things, unauthorized sales of Silva family corks directly into the United States market that were deliberately hidden from Neil and Corks USA (wire fraud, in violation of 18 U.S.C. § 1343), ███████████████████████████ (mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343), ████████████ ████████████████████████████████████████████ ██████████████████████████ (wire fraud, in violation of 18 U.S.C. § 1343), ████████████████████████████████████████████ ████████████████████ (wire fraud, in violation of 18 U.S.C. § 1343), the use of secret Maltese shell companies to backdoor additional cork shipments to Corks USA's competitors in the United States market (wire fraud, in violation of 18 U.S.C. § 1343), and finally threats against, direct

challenges to, and interference with Neil's express authority to manage Corks USA and to be compensated fairly for his good efforts (interference with commerce by extortion, in violation of 18 U.S.C. § 1951). Such activities establish a pattern of racketeering within the meaning of 18 U.S.C. § 1961(1).

154.   Upon information and belief, this pattern of wrongful facts bears resemblance to a broader pattern of wrongful acts designed to take advantage of other business partners of the Silvas in other areas and markets around the globe.

155.   The above-noted pattern of racketeering activity took place after the effective date of the RICO statute, and at least two of the acts were committed within ten years of each other.

156.   The above-noted pattern of racketeering activity affected and continues to effect interstate or foreign commerce because it involved commerce taking place among the United States and with at least two foreign countries: Portugal and Malta.

157.   The enterprise, Cortiças, affected and continues to effect interstate or foreign commerce because it is engaged in commerce taking place among the United States and with Portugal and Malta.

158.   These actions of MAS and José Silva violate 18 U.S.C. § 1962(c).

159.   As a result of this violation of 18 U.S.C. § 1962(c) by Defendants and co-conspirators known and unknown, Plaintiffs have been and continue to be injured in their business and property in an amount to be determined at trial that is estimated to be in the tens of millions of dollars. Plaintiffs seek all relief available under 18 U.S.C. § 1964, including but not limited to injunctive relief under § 1964(a) and treble damages and attorney's fees under § 1964(b).

## COUNT III

**RICO Act: Violation of 18 U.S.C. § 1962(a) (against all Defendants except Cortiças)**

160.   Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

161.     Defendants and co-conspirators known and unknown have violated 18 U.S.C. § 1962(a) by receiving income from a pattern of racketeering activity and have used or invested, directly or indirectly, such income, or the proceeds of such income, in the operation of an enterprise, namely Cortiças, which is engaged in interstate or foreign commerce.

162.     As alleged above, Defendants and co-conspirators known and unknown embarked on a multi-faceted pattern of acts to defraud, extort, bully, and undermine Neil and Corks USA. This pattern involved, among other things, unauthorized sales of Silva family corks directly into the United States market that were deliberately hidden from Neil and Corks USA (wire fraud, in violation of 18 U.S.C. § 1343), █████████████████████████ (mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343), ████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████ (wire fraud, in violation of 18 U.S.C. § 1343), ██████████████████████████████████████████████ ████████████████████████ (wire fraud, in violation of 18 U.S.C. § 1343), the use of secret Maltese shell companies to backdoor additional cork shipments to Corks USA's competitors in the United States market (wire fraud, in violation of 18 U.S.C. § 1343), and finally threats against, direct challenges to, and interference with Neil's express authority to manage Corks USA and to be compensated fairly for his good efforts (interference with commerce by extortion, in violation of 18 U.S.C. § 1951).  Such activities establish a pattern of racketeering within the meaning of 18 U.S.C. § 1961(1).

163.     The ill-gotten proceeds of the pattern have been used to fund and continue the operations of Cortiças' cork manufacturing and international distribution business.

164.     The above-noted pattern of racketeering activity took place after the effective date of the RICO statute, and at least two of the acts were committed within ten years of each other.

165.     Defendants and co-conspirators known and unknown targeted and continue to target an enterprise in interstate commerce, namely Cortiças, with their pattern of racketeering activity.

COMPLAINT

166.   Cortiças, the enterprise targeted by Defendants and co-conspirators known and unknown regularly engages in both interstate and foreign commerce.

167.   The actions of Defendants and co-conspirators known and unknown violate 18 U.S.C. § 1962(a).

168.   As a result of the pattern of racketeering activity engaged in by Defendants and co-conspirators known and unknown, Plaintiffs have endured and continue to endure injuries to their business and property in an amount to be determined at trial that is estimated to be in the tens of millions of dollars.  Plaintiffs seek all relief available under 18 U.S.C. § 1964, including but not limited to injunctive relief under § 1964(a) and treble damages and attorney's fees under § 1964(b).

## COUNT IV

**RICO Act: Conspiracy under 18 U.S.C. § 1962(d) to Violate 18 U.S.C. § 1962(a) and (c)**
**(against all Defendants)**

169.   Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

170.   Defendants and co-conspirators known and unknown have violated and continue to violate 18 U.S.C. § 1962(d) by entering into overlapping agreements to violate 18 U.S.C. § 1962(a) and (c) by receiving and continuing to receive income from a pattern of racketeering activity and by using or investing, directly or indirectly, such income, or the proceeds of such income, in the operation of an enterprise engaged in interstate or foreign commerce (Cortiças), and by being associated with one or both enterprises, Corks USA and Cortiças, and conducting or participating directly or indirectly in the conduct of those enterprises through a pattern of racketeering activity.

171.   As alleged above, Defendants and co-conspirators known and unknown, entered into overlapping agreements to engage in a multi-faceted pattern of acts to defraud, extort, bully, and undermine Neil and Corks USA. This pattern of acts involved, among other things, unauthorized sales of Silva family corks directly into the United States market that were deliberately hidden from Neil and Corks USA (wire fraud, in violation of 18 U.S.C. § 1343),

████████████████████████████████ (mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343), ████████████████████████ ████████████████████████████████████████ ██████████████████████████ (wire fraud, in violation of 18 U.S.C. § 1343), ██████████ ████████████████████████████████████████████████ ██████████████ (wire fraud, in violation of 18 U.S.C. § 1343), the use of secret Maltese shell companies to backdoor additional cork shipments to Corks USA's competitors in the United States market (wire fraud, in violation of 18 U.S.C. § 1343), and finally threats against, direct challenges to, and interference with Neil's express authority to manage Corks USA and to be compensated fairly for his good efforts (interference with commerce by extortion, in violation of 18 U.S.C. § 1951). Such activities establish a pattern of racketeering within the meaning of 18 U.S.C. § 1961(1).

172. The above-noted pattern of racketeering activity took place after the effective date of the RICO statute, and at least two of the acts were committed within ten years of each other.

173. Defendants and co-conspirators known and unknown agreed to employ this pattern of acts to target multiple enterprises in interstate commerce, namely Corks USA and/or Cortiças.

174. Corks USA and Cortiças, the enterprises targeted by Defendants and co-conspirators known and unknown, regularly engage in both interstate and foreign commerce.

175. Defendants and co-conspirators known and unknown agreed to employ the above described pattern of acts that violated 18 U.S.C. § 1962(a) and (c).

176. As a result of these violations of 18 U.S.C. § 1962(d), Plaintiffs have endured and continue to endure injuries in an amount to be determined at trial that is estimated to be in the tens of millions of dollars. Plaintiffs seek all relief available under 18 U.S.C. § 1964, including but not limited to injunctive relief under § 1964(a) and treble damages and attorney's fees under § 1964(b).

## COUNT V

**Fraud and Intentional Deceit (against all Defendants)**

177.    Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

178.    Defendants defrauded Plaintiffs by deliberately concealing the relationship between M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva, on one hand, and Company A, on the other.  Defendants employed a number of devices in perpetuating this fraud, including scrubbing any signs of Company A from outgoing shipments in the Cortiças laboratory, using two Maltese shell companies to hide shipments from Cortiças to Company A, selective omission of the relationship between Cortiças and Company A in correspondence with Plaintiffs, and the deliberate failure to pay the "referral fee on an ongoing basis in the amount of five percent of the invoice amount" required by the Supply and Distribution Agreement.

179.    Further, MAS and José Silva defrauded Plaintiffs by misleading them about their intentions when visiting Corks USA's California facilities. The Silvas did so by deliberately concealing their corporate espionage from Plaintiffs and by giving another pretext for their visits.

180.    Plaintiffs were not directly involved in this activity, and the times, dates, and other circumstances surrounding this activity, other than those set forth above, are within the exclusive knowledge of Defendants and their co-conspirators, known and unknown

181.    On information and belief, Defendants' fraud against Plaintiffs is ongoing and has not ceased.

182.    On information and belief, Defendants engaged in this fraud against Plaintiffs to profit at Plaintiffs' expense and in an effort to devalue Corks USA for a potential buyout.

183.    As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

184.    Defendants' wrongful conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs.  Such activity constitutes oppression,

fraud, or malice under California Civil Code § 3294 and entitles Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT VI

**Civil Conspiracy to Commit Fraud and Intentional Deceit (against all Defendants)**

185.    Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

186.    Defendants conspired with each other and with others, known an unknown, to commit the conduct alleged in Count V.

187.    As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

188.    Defendants' wrongful conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs.  Such activity constitutes oppression, fraud, or malice under California Civil Code § 3294 and entitles Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT VII

**Tortious Interference with Contract (against all Defendants)**

189.    Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

190.    Defendants knew of the Supply and Distribution Agreement, Employment Agreement, and all amendments to those agreements, and that those agreements contained an exclusivity agreement between Cortiças and Corks USA.

191.    Despite knowing of these contracts and that agreement, Defendants intentionally engaged in conduct designed to disrupt, interfere with, and undermine Plaintiffs' contracts and agreement.

192. Further, despite knowing of these contracts and that agreement, Defendants engaged in conduct designed to injure Corks USA and openly violate the contracts and the agreement.

193. As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

194. Defendants' wrongful conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs. Such activity constitutes oppression, fraud, or malice under California Civil Code § 3294 and entitles Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT VIII

**Civil Conspiracy to Commit Tortious Interference with Contract (against all Defendants)**

195. Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

196. Defendants conspired with each other and with others, known an unknown, to commit the conduct alleged in Count VII.

197. As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

198. Defendants' wrongful conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs. Such activity constitutes oppression, fraud, or malice under California Civil Code § 3294 and entitles Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT IX

**Injunctive Relief (against all Defendants)**

199. Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

200.     Defendants knew of the Supply and Distribution Agreement, Employment Agreement, and all amendments to those agreements, and that those agreements contained an exclusivity agreement between Cortiças and Corks USA.

201.     As alleged herein, Defendants are knowingly conspiring to breach, and actively benefitting from the breach of, the exclusivity agreement between Cortiças and Corks USA, and have been doing so intentionally and continuously for at least ten years.

202.     Accordingly, Plaintiffs seek injunctive relief against Defendants enjoining Defendants from selling any corks to Company A in violation of the exclusivity agreement between Cortiças and Corks USA or, alternatively, ordering Defendants to escrow the "referral fee on an ongoing basis in the amount of five percent of the invoice amount" required by the Supply and Distribution Agreement.

## COUNT X

**Tortious Breach of Statutory Requirement of Good Faith and Fair Dealing (against M.A. Silva Cortiças, Lda.; M.A. Silva Holdings, Inc.; MAS; and José Duarte Tavares da Silva)**

203.     Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

204.     California Corporations Code § 17704.09(d) requires the members of a limited liability company to discharge the duties to the other members under their operating agreement and exercise any rights consistent with the obligation of good faith and fair dealing.

205.     Neil is a member of Corks USA.

206.     Holdings is the other member of Corks USA.

207.     M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva breached their obligations to Plaintiffs by engaging in the conduct alleged herein.

208.     M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva undertook the conduct alleged herein in bad faith.

209.    As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

210.    Defendants' wrongful conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs.  Such activity constitutes oppression, fraud, or malice under California Civil Code § 3294 and entitles Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT XI

**Civil Conspiracy to Commit Tortious Breach of Statutory Requirement of Good Faith and Fair Dealing (against M.A. Silva Cortiças, Lda.; M.A. Silva Holdings, Inc.; MAS; and José Duarte Tavares da Silva)**

211.    Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

212.    Defendants conspired with each other and with others, known an unknown, to commit the conduct alleged in Count XI.

213.    As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

214.    Defendants' wrongful conduct was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs.  Such activity constitutes oppression, fraud, or malice under California Civil Code § 3294 and entitles Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## COUNT XII

**Breach of Fiduciary Duty (against M.A. Silva Cortiças, Lda.; M.A. Silva Holdings, Inc.; MAS; and José Duarte Tavares da Silva)**

215.    Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

216.    Plaintiffs entrusted the Silvas, in their capacity as owners and operators of Cortiças and Holdings, as business partners in Corks USA's ventures.

217.     This created a fiduciary duty on the part of M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva to act in the best interests of Plaintiffs.

218.     M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva breached this fiduciary duty by taking action to injure Plaintiffs and devalue Corks USA.

219.     As a direct and proximate result of these actions, Plaintiffs have suffered damages in an amount to be determined at trial, but estimated to be in the tens of millions of dollars.

220.     These actions were motivated by oppression, fraud, and/or malice.  Thus, Plaintiffs are entitled to punitive damages.

## COUNT XIII

**Breach of Contract (against M.A. Silva Cortiças, Lda.; M.A. Silva Holdings, Inc.; MAS; and José Duarte Tavares da Silva)**

221.     Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

222.     The Operating Agreement, Supply and Distribution Agreement, Employment Agreement, and all amendments to those agreements, constitute valid contracts.

223.     Plaintiffs have performed all conditions covenants, and promises required of them by these agreements, except to the extent performance has been prevented, excused, or frustrated by the conduct of M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva.

224.     M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva breached these agreements through the above-alleged conduct.

225.     As a direct and proximate result of those breaches, Plaintiffs have suffered damages in an amount to be determined at trial but estimated to be in the tens of millions of dollars.

## COUNT XIV

**Unjust Enrichment (against M.A. Silva Cortiças, Lda.; M.A. Silva Holdings, Inc.; MAS; and José Duarte Tavares da Silva)**

COMPLAINT

226. Plaintiffs reallege and incorporate by reference each and every paragraph in this Complaint as if set forth in full.

227. Through the above-mentioned conduct, M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva received benefits from Plaintiffs.  M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva have sold Plaintiffs corks at a price in excess of their true value and more than a modest profit.

228.  M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva have not compensated Plaintiffs for these actions.

229. As a result, M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva have retained the benefit received for their improper actions in selling corks to Plaintiffs to Plaintiffs expense and detriment.

230. As a direct and proximate cause of M.A. Silva Cortiças, Lda., M.A. Silva Holdings, Inc., MAS, and José Silva's actions, Plaintiffs have suffered damages in an amount to be determined at trial but estimated to be in the tens of millions of dollars.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1. For any and all relief available under 18 U.S.C. § 1964;

2. For compensatory and general damages according to proof;

3. For consequential, special, and incidental damages according to proof;

4. For declaratory and injunctive relief according to proof;

5. For prejudgment interest at the maximum legal rate;

/ / /

/ / /

/ / /

/ / /

6.      For punitive and exemplary damages according to proof;

7.      For reasonable attorneys' fees and costs; and

For such other and further relief as the Court may deem just and proper.


DATED: July 27, 2022                 Respectfully submitted,

                                     MINTZ, LEVIN, COHN, FERRIS,
                                      GLOVSKY AND POPEO, P.C.


                                     By:  */s/ Evan S. Nadel*
                                     Evan S. Nadel (SBN 213230)
                                     ENadel@mintz.com
                                     44 Montgomery Street, 36th Floor
                                     San Francisco, CA 94104
                                     Telephone:  (415) 432-6000
                                     Facsimile: (415) 432-6001

                                     Keith P. Carroll (MA BBO # 666039)
                                     (*pro hac vice forthcoming*)
                                     KPCarroll@mintz.com
                                     Sean B. Kennedy (MA BBO # 703560)
                                     SBKennedy@mintz.com
                                     (*pro hac vice forthcoming*)
                                     One Financial Center
                                     Boston, Massachusetts 02111
                                     Telephone:  (617) 542-6000
                                     Facsimile: (617) 542-2241

                                     Attorneys for Plaintiffs
                                     M.A. Silva Corks USA, LLC and Neil Foster

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: July 27, 2022                          Respectfully submitted,

MINTZ, LEVIN, COHN, FERRIS,
 GLOVSKY AND POPEO, P.C.

By:  */s/ Evan S. Nadel*
Evan S. Nadel (SBN 213230)
ENadel@mintz.com
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone:  (415) 432-6000
Facsimile: (415) 432-6001

Keith P. Carroll (MA BBO # 666039)
(*pro hac vice forthcoming*)
KPCarroll@mintz.com
Sean B. Kennedy (MA BBO # 703560)
SBKennedy@mintz.com
(*pro hac vice forthcoming*)
One Financial Center
Boston, Massachusetts 02111
Telephone:  (617) 542-6000
Facsimile: (617) 542-2241

Attorneys for Plaintiffs
M.A. Silva Corks USA, LLC and Neil Foster

COMPLAINT