1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7

M.A. SILVA CORKS USA, LLC, et al.,

Plaintiffs,

v.

M.A. SILVA HOLDINGS, INC., et al.,

Defendants.

Case No.  22-cv-04345-AMO

**ORDER DENYING MOTION FOR LEAVE TO FILE COUNTERCLAIMS, AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 77, 89

8
9
10
11
12
13

14    This case is a contract dispute related to cork sales.  Before the Court are Defendants'

15  motion for leave to file counterclaims and Plaintiffs' motion for partial summary judgment.

16  Having read the papers filed the parties and carefully considered their arguments therein and those

17  made at the hearing, as well as the relevant legal authority, the Court hereby **DENIES** Defendants'

18  motion for leave to file counterclaims, and **GRANTS IN PART** and **DENIES IN PART**

19  Plaintiffs' motion for partial summary judgment.

20  **I.    BACKGROUND**

21    **A.  Factual Background**

22    Plaintiffs Neil Foster and Defendant M.A. Silva Holdings, Inc. ("Holdings") have jointly

23  and equally owned Plaintiff M.A. Silva Corks USA, LLC ("Corks USA"), a wine cork distribution

24  business based in Santa Rosa, California, for 23 years.[1]  Cortiças Ans. (ECF 50) ¶¶ 2, 3, 10, 12.

25  Foster has been Corks USA's sole manager since its formation, *id.* ¶ 10, and Manuel Alves da

26

27    _____

[1] In a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party and gives it the benefit of all reasonable inferences to be drawn from those facts.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Silva ("M. Silva") is the president of Holdings.  M.S. Ans. (ECF 76) ¶¶ 12-13; J.S. Decl. (ECF 88-3) ¶ 6.

Foster and Holdings entered into three agreements: the Operating Agreement for Corks USA, which enables Corks USA to import and sell Cortiças corks in the United States, Cortiças Ans. ¶ 30; Goodrich Decl., Ex. 11; the Employment Agreement between Foster and Corks USA, which lays out Foster's rights and obligations as Manager, including that he may not purchase or promote corks from any entity except M.A. Silva Cortiças, Lda. ("Cortiças"), Goodrich Decl. (ECF 78), Ex. 12 § 4; and the January 2001 Supply and Distribution Agreement ("SDA"), Cortiças Ans. ¶ 33; Goodrich Decl. Ex. 3, at 1.

The SDA states that "[t]he Supplier [Cortiças] hereby appoints the Distributor [Corks USA] as its exclusive (with the exceptions set forth in this Agreement) distributor and marketer for the resale of corks in the United States . . ." and that the "Distributor will be entitled to describe itself as the Supplier's 'Exclusive Authorized Distributor' for corks in the United States . . . [.]" Goodrich Decl., Ex. 3 ("SDA") § 2.  The SDA requires Cortiças to inform Corks USA if it "learn[s] of any new potential customer for corks in the United States," and pay Corks USA a referral fee if the person becomes a direct customer of Cortiças.  SDA § 5.2.  The SDA also requires Cortiças to credit or replace defective corks, *id.* § 3.11, timely deliver corks, and use "all reasonable endeavours to meet the delivery date," *id.* §§ 3.2, 3.6.  In connection with these rights, Cortiças granted Corks USA a license to use the name "M.A. Silva" in connection with its sale and distribution of corks, including any logo or trademark rights related to the name.  *Id.* § 9.

Cortiças is a Portuguese entity jointly owned and operated by M. Silva and José Duarte Tavares da Silva ("J. Silva"), with M. Silva serving as president and founder, and J. Silva serving as CEO.  Cortiças Ans. ¶¶ 11, 13, 14; M.S. Ans. ¶ 13; J.S Ans. (ECF 59) ¶ 14.  Cortiças is the sole owner of Holdings.  Cortiças Ans. ¶ 12; J.S. Decl. ¶ 6.  Holdings is solely managed by M. Silva and has no board of directors or employees.  *Id.*

Iberian Cork International Ltd. ("Iberian Cork") is a limited liability company ("LLC") organized under the laws of Malta owned and operated by M. Silva (60%) and J. Silva (40%).  J.S. Iberian Cork, and Cork Partners Ans. ("J.S. Ans.") (ECF 59) ¶ 16; Goodrich Decl., Ex. 6 at 2:13-

19, 3:1; M.S. Ans. ¶ 16.  Cork Partners International Ltd. ("Cork Partners") is a separate Maltese LLC owned and operated by M.S. (60%) and J.S. (40%).  J.S. Ans. ¶ 15; J.S. Decl. ¶ 7.  Cork Partners is a holding company formed solely to hold Iberian Cork shares, and otherwise has no assets.  Goodrich Decl., Ex. 8 at 6:11-18.  Cork Partners shares document storage, leadership, and some officers with Cortiças.  Goodrich Decl. Ex. 9 at 10:21-11:15.

From 2018 through 2022, Cortiças and Iberian Cork sold 48 million corks at a cost of $8,881,843 to Scott Laboratories, Inc. ("Scott Labs"), a direct competitor of Corks USA, without informing Foster and Corks USA.  Goodrich Decl. Ex. 5 at 4:20-5:23; Ex. 7 at 3:1-5:13, 11:2-14; Ex. 13 ¶¶ 2, 6-7.  At least one reason why J. Silva formed Iberian Corks was to sell corks in the USA or Canada without involving or having to pay anything to Corks USA.  Goodrich Decl., Ex. 7 at 10:14-20, 11:2-28.

In late 2019, Cortiças and Scott Labs entered into a Confidentiality Agreement regarding the distribution of corks in North America.  Goodrich Decl., Ex. 7 at 15:7-22, 16:10-17; Ex. 13 ¶ 15.  During discussions about a potential sale of Corks USA, Cortiças provided Scott Labs with confidential material, including Corks USA's Profit & Loss Statements, Balance Sheet, and Statements of Income.  Goodrich Decl., Ex. 13 ¶ 16.  Foster and Corks USA were not aware of the transactions with Scott Labs.  Goodrich Decl., Ex. 10 ("Foster Decl.") ¶ 12.

Beginning in 2015, Cortiças routinely delivered cork shipments late or without sufficient time for Corks USA to verify the quality.  Foster Decl. ¶ 10.

**B.  Procedural Posture**

On July 27, 2022, Foster and Corks USA (collectively, "Plaintiffs") filed a complaint against Cortiças, Holdings, M. Silva and J. Silva, Cork Partners, and Iberian Cork (collectively, "Defendants").  ECF 1.  Plaintiffs filed the operative complaint, the Second Amended Complaint, on March 15, 2023.  ECF 61.  Therein, Plaintiffs allege multiple RICO violations, fraud, conspiracy to commit fraud, tortious interference with contract, tortious breach, breach of fiduciary duties, and breach of contract.  *Id.* at 23-35.

On August 24, 2023, Plaintiffs moved for partial summary judgment on their causes of action for fraud (count five), tortious interference and breach (counts seven and eight), breach of

fiduciary duty (count nine) and breach of contract (count ten).  ECF 77 ("MSJ").  On November 1, 2023, approximately a month after Defendants opposed the motion for summary judgment, Defendant Holdings filed a motion for leave to file counterclaims.  ECF 89.

The Court first addresses the motion for leave to file counterclaims before considering the motion for summary judgment.

## II.      MOTION FOR LEAVE TO FILE COUNTERCLAIMS

Defendant Holdings moves for leave to amend the scheduling order and file counterclaims against Plaintiffs Foster and Corks USA.  ECF 89.  Additional procedural background is necessary to analyze the merits of Holdings' motion.

### A.  Procedural Background

In July 2019, M. Silva sent Foster a letter terminating Foster as the Manager of Corks USA after a disagreement about Foster's Employment Agreement.[2]  Villagomez Decl. (ECF 89-1) at 16. In August 2019, Foster brought claims against Holdings in San Francisco County Superior Court seeking declaratory relief regarding the interpretation of his Employment Agreement ("First State Court Action").  *Id.* at 2.  Foster voluntarily dismissed the First State Action on July 18, 2022, and initiated the present action ("Federal Action") against Holdings, Cortiças, the Silvas, Iberian, and Cork Partners.  *Id.* at 80; ECF 1.  On July 19, 2022, Foster withdrew and paid himself $4.5 million from Corks USA's bank account.  Villagomez Decl. ¶ 4, Ex. 2.  Foster's payment to himself underlies the five claims that Holdings seeks leave to bring.

On October 26, 2022, this Court entered a Scheduling Order setting a January 13, 2023, deadline to amend pleadings.  ECF 48.  Holdings and Cortiças filed their answer to the complaint on November 18, 2022.  ECF 50.  J. Silva, Iberian, and Cork Partners answered on February 28, 2023.  ECF 59.  M. Silva answered on August 17, 2023.  ECF 76.  None of the responsive pleadings included counterclaims.

On March 23, 2023, eight months after Plaintiffs filed the Federal Action, and four months

---

[2] These are the factual allegations presented by Holdings in its motion for leave to file counterclaims and considered by the Court for purposes of this motion.  These are not the factual findings of the Court.

United States District Court
Northern District of California

after Holdings filed its answer, Holdings filed a complaint in California Superior Court against Foster and Corks USA ("Second State Action") for breach of contract, breach of fiduciary duty, violation of California Penal Code Section 496, unjust enrichment, and "removal of manager for cause" – all claims arising from Foster's $4.5 million withdrawal.  Villagomez Decl., Ex. 2 at 73; Shamonki Decl., Ex. 4.[3]  Holdings served Foster two months later in May 2023.  Shamonki Decl., Ex 5 at 5.  Foster and Corks USA filed a demurrer on June 30, 2023, arguing that the claims presented in the Second State Action were compulsory counterclaims in the Federal Action.  *Id.*, Ex. 3.  On August 3, 2023, the state court sustained Plaintiffs' demurrer without leave to amend. *Id.*, Ex. 7.  The state court found that the causes of action in the Second State Action were related to the claims in the Federal Action as the state action alleged breach of Cork's Operating Agreement and breaches of fiduciary duties against each Foster and Holdings as co-owners of Corks USA.  *Id.* at 3-4.  The state court accordingly found that the allegations were compulsory counterclaims and dismissed the case without leave to amend on August 3, 2023.  *Id.* at 5.  The state court entered judgment on September 7, 2023.  *Id.*, Ex. 5 at 3.  Holdings appealed the dismissal on October 16, 2023.  *Id.*  On November 1, 2023, Holdings filed the instant motion for leave to amend the scheduling order and file counterclaims.  ECF 89.

### B.  Leave to Amend Pleadings and Scheduling Order

A motion for leave to amend the pleadings is generally governed by Federal Rule of Civil Procedure 15(a)(2), which provides that a court should "freely give leave when justice so requires."  However, where, as here, a court has entered a pretrial scheduling order that establishes a deadline for amending the pleadings and that deadline has passed, a party's ability to amend the pleadings is governed by Rule 16(b).  *Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1277 (9th Cir. 2023).

Federal Rule of Civil Procedure 16 dictates that a schedule may only be modified for "good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4); *see Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).  "Good cause" may be shown where pretrial deadlines

---

[3] The Court relies on Plaintiffs' counsel's timeline as it is undisputed by Holdings.

"cannot reasonably be met despite the diligence of the party seeking the extension." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)).  Although a court may consider prejudice to the party opposing modification of the scheduling order, the "good cause" standard focuses primarily on the diligence of the moving party.  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013) ("*Wholesale*") *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (citing *Johnson*, 975 F.2d at 609).  If the moving party was not diligent, the inquiry should end, and the motion should be denied.  *Zivkovic*, 302 F.3d at 1087 (citing *Johnson*, 975 F.2d at 609); *see Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 764 (9th Cir. 2017) ("*D.M.S.I.*").

Holdings moves for leave to file counterclaims against Plaintiffs for violation of California Penal Code section 496, breach of fiduciary duty, breach of contract, unjust enrichment, and "removal of manager for cause" based on Foster allegedly taking $4.5 million from Corks USA in July of 2022 without Holdings' consent.  ECF 89-1 at 128-132.  Holdings explains that it did not bring these claims earlier because of its "reasonable belief that its claims did not constitute compulsory counterclaims in the instant action."  ECF 89 at 6-7.  Plaintiffs respond that Holdings (1) has not shown good cause to modify the scheduling order under Rule 16; and (2) that the amended pleadings are unduly prejudicial, delayed, and brought in bad faith pursuant to Rule 15.  The Court takes up these arguments in turn.

### 1. Good Cause Under Rule 16(b)

Parties seeking amendment of a scheduling order typically must show diligence through timely pursuit of their claims.  *See Wholesale*, 715 F.3d at 737 (holding that the district court properly concluded that plaintiffs were not diligent in seeking to amend complaints to add claims that they had known since the beginning of the lawsuit); *Zivkovic*, 302 F.3d at 1087 (affirming district court's ruling that plaintiff did not show diligence where he waited four months in seeking to amend the scheduling order); *D.M.S.I.*, 871 F.3d at 765 (defendants were not diligent where they "knew about [the defenses and counterclaims] long before the deadline to amend had passed").

Foster and Corks USA argue that the motion for leave to amend should be denied because

6

Holdings fails to satisfy the good cause standard of Rule 16(b).  ECF 97 at 13-17.  They stress that Holdings learned about the potential counterclaims in July of 2022 – the same time Plaintiffs initiated the Federal Action – and before the Court had set a deadline for amending pleadings or Holdings had answered the complaint.  *Id.* at 9, 14-15.

Holdings, as it must, acknowledges that it failed to raise these counterclaims in the six months prior to the deadline to amend pleadings, or in the nearly ten months that followed the deadline to seek leave to amend.  ECF 89 at 9-10.  Instead, it explains that it believed that the claims were not compulsory counterclaims, and "re-evaluated its options and litigation strategy after Plaintiffs' demurrer in the State Court Action was sustained."  *Id.* at 6-7, 17.  However, a change in litigation strategy does not constitute good cause when the facts giving rise to the claims were known to Holdings for approximately 16 months.  *See, e.g.*, *Napear v. Bonneville Int'l Corp.*, No. 2:21-CV-01956-DAD-DB, 2023 WL 4747623, at *5 (E.D. Cal. July 25, 2023) ("a mere change in litigation strategy is insufficient to constitute good cause" and plaintiff was not diligent where he waited 14 months after discovery of evidence to file a motion for leave to amend).

Even if the Court were to credit Holdings' mistaken belief that the claims were not compulsory counterclaims, the state court dismissed Holdings' claims without leave to amend on August 3, 2023, explicitly stating that the claims were compulsory counterclaims to the causes of action in the Federal Action.  Shamonki Decl., Ex. 7 at 3-5.  Holdings then waited another three months, until November 1, 2023, to move to amend the scheduling order and file counterclaims. At the hearing, Holdings stated only that it was considering next steps during that time.  Notably, the proposed counterclaims are nearly identical to the claims brought in the Second State Court Action.  *See* ECF 89-1 at 121-132; ECF 99-4 at 3-15.  Considering this significant delay in seeking amendment as well as the state court's express finding that the claims at issue were compulsory counterclaims to this Federal Action, the Court finds that Holdings fails to show diligence in pursuing these claims against Foster and Corks USA, and thus fails to show good cause to modify the Scheduling Order.

### 2.  Leave to Amend Under Rule 15

Much of Holdings' arguments in support of its motion for leave to file counterclaims rely

United States District Court
Northern District of California

1    on Federal Rule of Civil Procedure 15, which states that the court should "freely grant leave" to

2    amend pleadings "when justice so requires."  Fed. R. Civ. P. 15(a).  However, the Ninth Circuit

3    has made clear that "when a party seeks to amend a pleading after the pretrial scheduling order's

4    deadline for amending the pleadings has expired, the moving party must satisfy the 'good cause'

5    standard of Federal Rule of Civil Procedure 16(b)(4)," as discussed above.  *Wholesale*, 715 F.3d at

6    737; *see Coleman*, 232 F.3d at 1294 (holding that the district court correctly addressed leave to

7    amend under Rule 16 as opposed to Rule 15 where it had filed a pretrial scheduling order

8    establishing a deadline for amending pleadings and that deadline had expired).

9      Assuming for the sake of argument that Holdings had showed good cause to modify the

10   scheduling order, it would also need to demonstrate that leave to amend is warranted under Rule

11   15.  *Johnson*, 975 F.2d at 608.  Courts consider five factors in determining whether to grant leave

12   to amend: (1) undue delay; (2) bad faith or dilatory motive; (3) prejudice to the opposing party; (4)

13   futility of amendment; and (5) repeated failure to cure deficiencies by amendments previously

14   allowed.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (citing

15   *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Of these factors, prejudice "carries the greatest

16   weight."  *Id.*  As prejudice is the most important factor, the Court considers prejudice before

17   turning to the remaining factors.

18     **a.  Prejudice**

19     Holdings argues that Plaintiffs will not suffer undue prejudice because the counterclaims

20   will not change the scope of the litigation,[4] these disputes have already been litigated, any

21   discovery will be minimal, and the April 22, 2024, trial date may be maintained.[5]  ECF 89 at 13-

22   14.  Foster and Corks USA contend that if the Court permits Holdings to bring its proposed

23   counterclaims at such a late stage, Plaintiffs will need to spend time and money on a potential

24

25   [4] To support this argument, Holdings points out that the state court determined that both actions
     "concern the same contracts, similar facts, and similar claims."  ECF 89 at 14.  Of course, this
26   augurs against Holdings' argument that it acted diligently in seeking leave, as it shows Holdings'
27   awareness of the similarity of the claims.

28   [5] The Court has since moved the April 2024 trial date to accommodate the Court's schedule.

1    motion to dismiss; additional written and oral discovery; to reengage experts on Holdings'

2    damages claims; and to write and argue another motion for summary judgment if they cannot

3    dismiss the matter at the 12(b)(6) stage.  ECF 97 at 18.  Foster and Corks USA argue that this will

4    make it unlikely that the case timely proceeds to trial.

5         Courts find prejudice to a party where its opponent seeks to add claims requiring additional

6    discovery after the discovery deadline and the parties have already filed dispositive motions.  *See*

7    *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387-88 (9th Cir. 1990) (finding prejudice to opposing

8    party where additional claims "advance different legal theories and require proof of different

9    facts" such that the defendant would have to go through the time and expense of continued

10   litigation); *cf. DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 188 (9th Cir. 1987) (concluding

11   that the timing of the proposed amendment was not prejudicial where the case was still at the

12   discovery stage, and there was no pretrial conference or trial scheduled).  Similarly, courts find

13   undue prejudice where a litigant seeks to shift the focus of the case years after the suit was first

14   filed and shortly before the discovery cutoff, particularly where the shift in legal theories would

15   nullify prior discovery and require additional discovery.  *See Scognamillo v. Credit Suisse First*

16   *Bos., LLC*, 587 F. Supp. 2d 1149, 1156-57 (N.D. Cal. 2008) (citing cases); *see also McGlinchy v.*

17   *Shell Chem. Co.*, 845 F.2d 802, 809 (9th Cir. 1988) (affirming district court's finding of prejudice

18   where the new claims would have "required additional discovery on a wide range of new issues,"

19   including new depositions, and defendants were "entitled to rely on a timely close of discovery

20   and a near-term trial date").

21        Holdings suggests that because the five counterclaims it moves to file concern similar facts

22   and causes of action, the new claims would not "greatly alter[] the nature of the litigation" or

23   "require [plaintiffs] to [] undertake[], at a late hour, an entirely new course of defense."  ECF 89 at

24   13 (citing *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)).  Not

25   so.  If the Court permits the introduction of the proposed counterclaims, Plaintiffs will be required

26   to defend against new claims substantively different from those litigated so far.  Moreover, fact

27   discovery closed on June 9, 2023, and expert discovery closed on November 10, 2023.  ECF 48,

28   86.  The difficulty posed to Foster and Corks USA in addressing the new claims would be

United States District Court
Northern District of California

1  exacerbated where the parties have already conducted substantial discovery, there is a pending

2  motion for summary judgment, and trial is set to begin in a few months.  Accordingly, the Court

3  concludes that Plaintiffs will be prejudiced by allowing Holdings to bring counterclaims at such a

4  late stage in the proceedings.

5          **b.  Undue Delay**

6          While prejudice is typically the key factor, "[u]ndue delay is a valid reason for denying

7  leave to amend." *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991) (citation omitted);

8  *see also Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir.

9  1986) (holding that "late amendments to assert new theories are not reviewed favorably when the

10  facts and the theory have been known to the party seeking amendment since the inception of the

11  cause of action.").

12         Holdings argues that it has not unduly delayed in advancing its proposed counterclaims

13  because the case did not become "fully at issue" until M. Silva filed his answer on August 17,

14  2023.  ECF 89 at 15.  However, Holdings cites no authority for this proposition.  Moreover, M.

15  Silva's answer is irrelevant, as it is Holdings – not M. Silva – that now seeks to file counterclaims,

16  rather than when it answered Plaintiffs' complaint on November 18, 2022.  The timing of M.

17  Silva's answer also does not change Holdings' awareness of the existence of the claims since July

18  2022 and failure to move to file the counterclaims until November 2023.  Indeed, "[w]hether the

19  moving party knew or should have known facts and theories raised in the proposed amendment at

20  the time it filed its original pleadings is a relevant consideration in assessing timeliness." *Fresno*

21  *Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160, 1176 (E.D. Cal. 2013).

22         The only reason that Holdings puts forth as to why it delayed so long is that it believed that

23  the claims should be brought in state court, stating that "any undue delay should be excused by

24  Holdings' reasonable belief that its claims did not constitute compulsory counterclaims in the

25  instant action."  ECF 89 at 15.  Holdings' misunderstanding of the law is not a valid reason for

26  delay.  *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993)

27  ("inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute

28  'excusable' neglect . . .."); *Fresno Unified*, 980 F. Supp. 2d at 1176 (citing *Swanson v. U.S. Forest*

United States District Court
Northern District of California

*Service*, 87 F.3d 339, 345 (9th Cir. 1996) ("A moving party's inability to acceptably explain its delay may indicate that the delay was undue.").  Moreover, as discussed above, Holdings brought this motion five months after the close of fact discovery, nine days before the close of expert discovery, three months after the state court dismissed its claims on the basis that they were compulsory counterclaims, and ten months after the Scheduling Order deadline to amend pleadings expired.

There is no evidence of bad faith, and the parties do not discuss the other factors courts consider in determining whether to grant leave to amend.  Given the failure to show good cause to amend the scheduling order, the Court **DENIES** Holdings' motion for leave to amend the scheduling order.  And given the prejudice to Foster and Corks USA, as well as the undue delay by Defendants in bringing these counterclaims, the Court also concludes that leave to amend is not warranted under Rule 15.  *See Texaco, Inc.*, 939 F.2d at 798-99 (affirming denial of leave to amend due to undue delay and prejudice).

### III.    Motion for Summary Judgment

The Court next takes up Plaintiffs' motion for partial summary judgment.

#### A.   Summary Judgment Standard

Summary judgment shall be granted if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations" show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  "Material facts" are those which may affect the outcome of the case. *See Anderson*, 477 U.S. at 248.  A dispute as to a material fact is genuine if there is sufficient evidence for a "reasonable jury" to return a verdict for the nonmoving party.  *Id.*  The court "may not weigh the evidence or make credibility determinations." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).  The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  "To survive summary judgment, a plaintiff must set forth non-

United States District Court
Northern District of California

1    speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel.*

2    *v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

3         Plaintiffs argue that they are entitled to judgment as a matter of law on their claims for

4    breach of contract, tortious interference and breach, breach of fiduciary duties, and fraudulent

5    concealment.  ECF 77 ("MSJ").  Plaintiffs argue that each Defendant is liable under an alter ego

6    liability theory.  The Court considers each claim in turn.

7         **B. Breach of Contract**

8         A cause of action for breach of contract requires "(1) [the existence of] the contract, (2)

9    the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's

10   breach, and (4) the resulting damages to the plaintiff."  *Richman v. Hartley*, 224 Cal. App. 4th

11   1182, 1186 (2014).

12        Corks USA moves for summary judgment on Cortiças' breach of the 2001 Supply and

13   Distribution Agreement ("SDA"), specifically, the SDA's exclusivity provision, as well as

14   provisions concerning the quality and timeline for corks delivered.  The Court first considers

15   whether Cortiças' actions violated the exclusivity provision of SDA.

16        **1. Exclusivity Provision**

17        Corks USA asserts that Cortiças[6] violated the exclusivity provision of the SDA by selling

18   corks to Scott Labs without informing or obtaining consent from Corks USA.  Defendants do not

19   dispute that the SDA signed by the parties is a valid, enforceable contract, and that Corks USA

20   fulfilled its contractual obligations under the SDA.  Defendants also do not dispute that from 2016

21   to 2022, Cortiças sold millions of dollars of cork to Scott Labs, a company that buys and sells

22   corks in the U.S., without informing Corks USA or paying a referral fee.  ECF 88 ("Opp.") at 15,

23   18-19.  Instead, Defendants challenge only breach and damages, and argue that this conduct did

24   not violate the exclusivity provision of the SDA because the SDA only prohibited Cortiças from

25   selling M.A. Silva-branded corks to companies seeking to resell "M.A. Silva-branded corks" in

26

27   ───────────────
     [6] Corks USA also brings the breach of contract claim against Holdings, Iberian Cork, Cork
     Partners, and Manuel and Jose Silva under an alter ego theory.  The Court discusses that theory of
28   liability in Section C below.

United States District Court
Northern District of California

1    the United States.  *Id.* at 15, 18-19.  The parties' main dispute is thus the interpretation of the

2    SDA's language.

3            In California, "[t]he language of a contract is to govern its interpretation, if the language is

4    clear and explicit, and does not involve an absurdity."  Cal. Civ. Code § 1638.  The "fundamental

5    goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the

6    time of contracting."  *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir.

7    2002); *see Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18-19 (1995) (internal quotations

8    omitted) (same).  "When a contract is reduced to writing, this intent 'is to be ascertained from the

9    writing alone, if possible.'"  *U.S. Cellular*, 281 F.3d at 934 (quoting Cal. Civ. Code § 1639); *see*

10   *also* Cal. Civ. Code §§ 1635-55 (codifying these interpretive principles).

11           Typically, courts may not rely on extrinsic evidence "to alter or add to the terms of the

12   writing" of an integrated written agreement.  *Riverisland Cold Storage, Inc. v. Fresno-Madera*

13   *Prod. Credit Assn.*, 55 Cal. 4th 1169, 1174 (2013); *see Vons Companies, Inc. v. United States Fire*

14   *Ins. Co.*, 78 Cal. App. 4th 52, 59 (2000) ("We do not have the power to create for the parties a

15   contract that they did not make and cannot insert language that one party now wishes were

16   there.").  However, a court may admit parol evidence to construe a contract when the contract

17   language is ambiguous.  *F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 963 (9th Cir. 2010).

18   Whether a written contract is ambiguous is a question of law.  *Airborne Freight Corp. v.*

19   *McPherson*, 427 F.2d 1283, 1285 (9th Cir. 1970) ("*McPherson*").

20           California law permits the admission of parol evidence "only if it is (1) 'relevant' to prove

21   (2) 'a meaning to which the language of the instrument is reasonably susceptible,'" i.e., when the

22   contract language is ambiguous.  *U.S. Cellular*, 281 F.3d at 938 (quoting *Pacific Gas & Elec. Co.*

23   *v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968)); *see In re Bennett*, 298 F.3d

24   1059, 1064 (9th Cir. 2002).  When contract language is ambiguous, courts may consider extrinsic

25   evidence under a two-part test.  *F.B.T. Prods*, 621 F.3d at 963.  First, the court provisionally

26   receives, without admitting, all credible evidence concerning the parties' intentions to determine

27   whether the language is "reasonably susceptible" to the interpretation urged by a party.  *Id.* (citing

28   *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992)).  If the Court decides that the language is

*United States District Court*
*Northern District of California*

"reasonably susceptible" to the party's interpretation, it may admit the extrinsic evidence to help interpret the contract.  *Id.*; *see Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1076 (9th Cir. 2010).  An ambiguity exists where a party can identify an "alternative, semantically reasonable, candidate of meaning of a writing."  *Solis v. Kirkwood Resort Co.*, 94 Cal. App. 4th 354, 360 (2001).  However, "[c]ourts will not add a term about which a contract is silent."  *Dameron Hosp. Assn. v. AAA N. California, Nevada & Utah Ins. Exch.*, 229 Cal. App. 4th 549, 569 (2014) (citation omitted).

The relevant provisions of the SDA state:

2.1 The Supplier [Cortiças] hereby appoints the Distributor [Corks USA] as its exclusive (with the exceptions set forth in this Agreement) distributor and marketer for the resale of corks in the United States, and the Distributor agrees to act in that capacity subject to the terms and conditions of this Agreement.

2.2 The Distributor will be entitled to describe itself as the Supplier's "Exclusive Authorized Distributor" for corks in the United States . . .

5.1 The parties acknowledge that Supplier has existing business with three accounts in the United States, and that Supplier has the right to continue to service . . . these accounts directly and without the participation or input of Distributor. These accounts are limited to: Robert Mondavi, E.J. Gallo and Ferrari Carano.

5.2 Should Supplier learn of any new potential customer for corks in the United States, Supplier will promptly inform Distributor.  If Distributor agrees that that person will become a direct customer of Supplier, Supplier will pay to Distributor a referral fee on an ongoing basis in the amount of five percent of the invoice amount from that customer, when and as received by Supplier.

9. To the extent necessary to accomplish its obligations under this Agreement, Supplier hereby grants to Distributor a royalty free license to use within the United States and during the term of this Agreement the name "M.A. Silva" in connection with corks, including any logo and any trademark rights therein.

Goodrich Decl., Ex. 3 ("SDA").

Corks USA asserts that the contract language clearly and unambiguously prohibits Cortiças from selling corks to any United States customers, except for the three specified pre-existing business accounts, without Corks USA's knowledge, consent, and referral payment.  MSJ at 21-22.  Cortiças contends that the exclusivity provision is ambiguous, as it may be interpreted to foreclose Cortiças from selling M.A. Silva branded corks to other customers in the United States

only if those customers would resell under the M.A. Silva brand.  Opp. at 17-18; M.S. Decl. (ECF 88-2) ¶ 10.  In support of this interpretation, Defendants submit extrinsic evidence of the contract's meaning – a declaration from M. Silva.

Here, the language of the contract is clear.  The SDA states that Cortiças agreed to sell "to no other person in the United States" except for Corks USA, excepting the three listed accounts. SDA §§ C, 5.1.  It further states that Cortiças will notify Corks USA if it learns of "any new potential customer for corks in the United States" and that Cortiças will pay Corks USA a referral fee if Corks USA "agrees that that person will become a direct customer" of Cortiças.  *Id.* § 5.2. The contract plainly prohibited Cortiças from selling corks to any other cork distributor in the U.S. besides Corks USA and the three pre-existing accounts.  Nothing in the language of the contract supports Defendants' interpretation that the SDA only prohibited Cortiças from selling M.A. Silva-branded corks to other U.S. resellers.  The Court finds the language of the contract unambiguous.  Thus, the Court does not consider extrinsic evidence of the contract's meaning.

Even if the Court were to consider M. Silva's declaration, the Court does not read it to support Defendants' proposed interpretation of the contract.  In the declaration, M. Silva states that he

> intended for the reference in Section 5.2 of the Agreement to 'any new potential customer for corks in the United States' and 'direct customer' to mean any buyer that desired to purchase and sell M.A. Silva corks under the M.A. Silva name in the United States. I did not intend for the SDA to mean that Cortiças was foreclosed from selling corks to other customers in the United States if those customers would not resell those corks under the M.A. Silva brand.

M.S. Decl. ¶ 10.  However, M. Silva's purported intention in entering the contract, as he describes it twenty-two years after the parties entered the SDA does not make the language "reasonably susceptible" to his interpretation.  *F.B.T. Prods*, 621 F.3d at 963.  Indeed, "[i]t is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce."  *Winet*, 4 Cal. App. 4th at 1166 (finding that tendered parol evidence of plaintiff's "uncommunicated subjective intent as to the meaning of the words of the contract" was inadmissible as it contradicted the contract language).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants offer no evidence showing that M. Silva's intention in entering the SDA was

2    mutually shared, or that M. Silva had or expressed this intent at the time of contracting.  *See id.*

3    Moreover, Defendants' interpretation of the contract would require reading the words "M.A. Silva

4    branded corks" into the contract.  The Court does cannot now "create for the parties a contract that

5    they did not make and cannot insert language that one party now wishes were there."  *Vons*

6    *Companies, Inc.*, 78 Cal. App. 4th at 59.  Defendants also argue that section 9 of the SDA, which

7    grants Corks USA a license to use the name "M.A. Silva," "corroborates that the Parties

8    strategically entered into the SDA to allow the company to market and distribute M.A. Silva-

9    branded corks."  Opp. at 18.  However, M. Silva admits in his declaration that Cortiças provides

10   "unbranded, plain corks" to Corks USA, and that Corks USA distributes corks without M.A. Silva

11   branding at the customer's discretion.  M.S. Decl. ¶ 12.  Thus, by M. Silva's own admission, the

12   SDA did not contemplate only the selling and distribution of M.A. Silva-branded corks.

13   Under the unambiguous reading of the contract, Cortiças appointed Corks USA as the

14   exclusive distributor and marketer for reselling corks in the United States, with the exception of

15   the three pre-existing accounts.  SDA §§ 2.1, 5.1.  Cortiças was required to inform Corks USA of

16   any new potential customers for corks in the United States, and to pay Corks USA a referral fee of

17   five percent of the invoice amount if Corks USA agreed that the person would become a direct

18   customer of Cortiças.  *Id.* § 5.2.  The undisputed evidence shows that Cortiças breached these

19   provisions when it sold cork to Scott Labs without Corks USA's knowledge or consent and

20   without paying Corks USA a referral fee.

21   Accordingly, the Court finds that there is no triable issue of material fact and **GRANTS**

22   summary judgment to Corks USA on its claim that Cortiças breached the contract.  As the parties

23   agree that there is a dispute of fact as to the amount of damages, *see* Opp. at 22-23, ECF 91 at 12,

24   the Court finds it proper to grant Corks USA partial summary judgment only on the issue of

25   liability for breach of contract.

26   **2.  Untimely and Poor-Quality Deliveries**

27   Corks USA also contends that Cortiças breached the SDA by failing to deliver timely

28   shipments.  MSJ at 22.  The SDA requires Cortiças to use "all reasonable endeavours to meet the

delivery date." SDA §§ 3.2, 3.6. Corks USA indicates that "starting in or around late 2015, cork shipments from Cortiças became significantly and regularly delayed." Foster Decl. ¶ 10. Although Defendants do not contest that there were shipping delays, Opp. at 22, they provide expert reports showing that any delays were attributable to factors outside of Cortiças' control, such as supply chain problems caused by COVID-19 and resulting labor shortages. *Id.* (citing Villagomez Decl. (ECF 88-1), Ex. 1 ¶¶ 23-24). Corks USA provides no evidence or argument contradicting Defendants' evidence. As Corks USA has not conclusively established that Defendants failed to use "reasonable endeavours to meet the delivery date," Corks USA has not shown that it is entitled to judgment as a matter of law.

Corks USA also contends that Cortiças breached the SDA by providing poor-quality cork to Corks USA. MSJ at 19, 22. The SDA requires that "all cork delivered by Supplier must conform to the [parties' established standard cork] grades, with a reasonable allowance for natural variation in the product." SDA § 4.1. It also specifies certain tests that must be conducted on the corks prior to shipment. *Id.* § 4.2. Corks USA provides evidence of customer complaints related to the presence of TCA[7] in the corks. *See* Goodrich Decl. Exs. 26-32. However, Plaintiffs fail to put forth evidence showing that Cortiças failed to conduct tests prior to shipment or that any variations were more than "reasonabl[y] allow[ed]." SDA § 4. Plaintiffs have thus not conclusively established breach under the terms of the contract, and the Court cannot grant summary judgment.

The Court accordingly **DENIES** summary judgment as to the breach of contract claim for Cortiças' delayed and poor-quality cork shipments.

### C. Alter Ego Liability

Plaintiffs contend that Holdings, Iberian Cork, Cork Partners, J. Silva, and M. Silva are liable for Cortiças' actions, including its breach of contract, because they are alter egos of Cortiças. MSJ at 23-26.

---

[7] TCA is a bacteria contaminant found in corks that causes "cork taint" and spoils the wine. Foster Decl. ¶ 7.

A "general principle of corporate law" is that "a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  But "the corporate veil may be pierced and [a] shareholder held liable for the corporation's conduct" in certain situations.  *Id.*  California courts have imposed alter ego liability, recognizing that "it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity."  *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249 (1991).  Courts may impose alter ego liability for parent-subsidiary or sister companies under the "single-enterprise rule."  *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 512 (2010) (quoting *Las Palmas*, 235 Cal. App. 3d at 1249-50).  Under the single enterprise rule, one company may be liable for the debts of another when the latter is "so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation."  *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013) (citation omitted).

The same principles apply for piercing the corporate veil to attach liability to a shareholder or to hold a different corporation liable as part of a single enterprise.  *Toho-Towa Co.*, 217 Cal. App. 4th at 1108.  To pierce the corporate veil, Plaintiffs must prove: (1) "such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist" and (2) "an inequitable result if the acts in question are treated as those of the corporation alone."  *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538 (2000).

In considering whether there is sufficient unity of interest and ownership, courts consider factors such as:

> inadequate capitalization, commingling of funds and other assets, holding out by one entity that it is liable for the debts of the other, identical equitable ownership, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.

*Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017) (citation omitted).

No single characteristic governs, *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539, and this determination is primarily a question of fact, *Toho-Towa Co.*, 217 Cal. App. 4th at 1108.

Plaintiffs argue that M. Silva, J. Silva, Iberian Cork, Cork Partners, and Holdings are liable for Cortiças' breach of contract because they are alter egos.  MSJ at 23.  Plaintiffs provide undisputed evidence that M. Silva and J. Silva own and control the various Defendant companies.[8] Plaintiffs also proffer undisputed evidence that the various companies share leadership, officers, and some employees,[9] and that some of the entities share document storage or offices.[10]  The record further shows that in addressing a wire transfer issue, Cortiças once directed Scott Labs to pay Cortiças for an amount owed to Iberian Cork (which it promised to then transfer the funds to Iberian Cork).  Second Goodrich Decl., Ex. 2 (ECF 92-2) at 3.  In another instance, J. Silva directed Scott Labs to wire money to Cortiças (as the cork supplier) instead of Iberian Cork.  *Id.*, Ex. 3 (ECF 92-3) at 2.  J. Silva also admits that at least one reason why he formed Iberian Cork was to sell corks in the United States without involving or having to pay anything to Corks USA.  Goodrich Decl., Ex. 7 at 10:14-20.

However, not all the Silva companies share employees (e.g., Cork Partners and Cortiças do

---

[8] *See* M.S. Ans. ¶¶ 13-14 (M. Silva is founder and president, and J. Silva is CEO, of Cortiças); J.S. Decl. ¶ 4 (J. Silva manages Cortiças jointly with the Board of Directors, which is made up of M. Silva, Elvira Silva, and J. Silva); J.S. Decl. ¶ 6 (Cortiças owns 100% of Holdings); *id.* (Holdings is solely managed by M. Silva and has no board of directors and no employees); J.S. Ans. ¶ 16 (M. Silva owns 60% of Iberian Cork and J. Silva owns 40%); J.S. Decl. ¶ 8 (J.S. is a director of Iberian Cork and Iberian Cork has one employee); Goodrich Decl., Ex. 8 at 6:11-18; J.S. Decl. ¶ 7 (Cork Partners is a holding company created for the sole purpose of holding Iberian Cork's shares); J.S. Decl. ¶ 7 (M. Silva owns 60% of Cork Partners and J. Silva owns 40%, Cork Partners has no employees, and J.S. is the Director and a shareholder); Goodrich Decl., Ex. 7 at 7:16-8:8 (J. Silva and M. Silva established Iberian Cork and Cork Partners together in 2017 and made the decision to have Iberian Cork sell corks to Scott Laboratories).

[9] J. Silva states that "the entities do not share leadership or ownership," J.S. Decl. ¶ 10, but that is belied by the evidence.  *See, e.g.*, J.S. Decl. ¶¶ 4, 6-8, 10 (J. Silva is CEO of Cortiças, which he jointly manages with a board including M. Silva, who manages Holdings); Goodrich Decl., Ex. 5 at 10:2-11:17, Ex. 9 at 11:2-15; J.S. Dec. ¶¶ 7-8 (Iberian Cork and Cork Partners share leadership with Cortiças and some of the same officers and employees).

[10] *See, e.g.*, Goodrich Decl., Ex. 5 at 10:10-16, Ex. 9 at 10:21-27 (Iberian Cork and Cortiças share document storage, and Cork Partners and Cortiças share document storage); M.S. Ans. ¶¶ 15-16; J.S. Ans. ¶¶ 15-16 (Cook Partners and Iberian Cork operate out of the same address in Malta); Foster Decl. ¶ 18 (Holdings and Cortiças operate out of the same office in Portugal).

not share employees).  Goodrich Decl., Ex 9 at 11:24-12:5.  Although the record shows that some of the companies share "some of the same officers and employees," there is no evidence of how many officers or employees overlap, the identity of the employees shared between the companies, or whether they have leadership roles.  Further, Plaintiffs have not presented evidence of commingling of funds, inadequate capitalization, or disregard of corporate formalities.

The Court recognizes that alter ego is an "extreme remedy" that is to be used "sparingly." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539; *see Gopal v. Kaiser Found. Health Plan, Inc.*, 248 Cal. App. 4th 425, 431 (2016), *as modified* (June 23, 2016) (imposition of alter ego liability is to be "approached with caution" and courts should disregard the corporate form "only in narrowly defined situations") (citation omitted).  Although J. Silva and M. Silva owned and held leadership positions in the various companies, and several of the companies wholly owned the others, "[t]otal ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015).  Indeed, to hold a parent corporation liable for the acts of a subsidiary, there must be "pervasive control," such as when a parent corporation "dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." *Id.* (citation omitted).  Plaintiffs have not presented such evidence here.

Ultimately, while Plaintiffs have presented evidence showing an overlap of interest and ownership among the various companies, these allegations are insufficient to establish alter ego liability as a matter of law.  *See Sonora Diamond Corp.*, 83 Cal. App. 4th at 538; *see, e.g.*, *whiteCryption Corp. v. Arxan Techs., Inc.*, No. 15-CV-00754-WHO, 2016 WL 3275944, at *9 (N.D. Cal. June 15, 2016) (finding no alter ego liability despite a company's "significant involvement in [the other's] operations, and despite "shar[ing] the same headquarters, officers, directors, and other employees," as there were no allegations of commingled funds, undercapitalization, or disregard of corporate formalities).   Given the amorphous nature of the test, and the fact-heavy nature of the inquiry, on the record before it, the Court finds that Plaintiffs have not established alter ego liability as a matter of law, and that this determination is best left to the province of a jury.

**D.  Remaining Claims**

Because Plaintiffs have not established alter ego liability as matter of law, the Court finds that there is a genuine dispute of material fact as to which Defendants may be liable for the remaining claims, including tortious interference, breach of fiduciary duty, and fraudulent concealment.  Given that the liability inquiry for these claims is fact-heavy (e.g., proving Defendants' intentions for the tortious interference and fraudulent concealment claims and proving materiality in the latter) and depends on a finding of alter ego liability (e.g., whether Holdings may be liable for Cortiças' actions in the breach of fiduciary duty claim), the Court **DENIES** summary judgment on the claims of fraud (count five), tortious interference (count seven), tortious breach (count eight), and breach of fiduciary duties (count nine).

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Corks USA's motion for summary judgment for Cortiças' liability for breach of contract as to the SDA's exclusivity provision and **DENIES** summary judgment for breach of contract as to Cortiças' untimely and poor-quality deliveries.  The Court **DENIES** Plaintiffs' motion for summary judgment as to J. Silva, M. Silva, Holdings, Iberian Cork, and Cork Partners' liability for breach of contract under an alter ego theory.  The Court also **DENIES** Plaintiffs' motion for summary judgment on the tortious interference and breach, breach of fiduciary duty, and fraudulent concealment claims.

**IT IS SO ORDERED.**

Dated: March 18, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**